**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

UNITED STATES OF AMERICA

v.  Case No. 6:14-cr-164-Orl-37TBS

MARCUS SAMPSON

---

**ORDER**

This cause is before the Court on the following:

1. Motion to Suppress Physical Evidence and Statement Evidence and Incorporated Memorandum of Law (Doc. 30), filed February 9, 2015; and

2. United States' Response in Opposition to Defendant's Motion to Suppress (Doc. 34), filed February 20, 2014.

Upon consideration, the Court finds that the Motion is due to be granted.

**FINDINGS OF FACT**[1]

At approximately 11:50 p.m. on March 8, 2014, Marcus Sampson was driving a rented silver Chevrolet Cruze in downtown Orlando, looking for a place to park so that he and his two passengers could attend the Beacham Theater on Orange Avenue. Sampson travelled west on Pine Street where he stopped at the traffic light at Pine and Garland. He proceeded to make a right-hand turn to head north on Garland. Unbeknown to Sampson, across the intersection in an unmarked Ford F-150 pickup truck were two Orlando Police Department officers who were assigned to the patrol tactical unit ("Tac

---

[1] The findings of fact are based off on the evidence received at the hearing on the Motion to Suppress (*see* Doc. 35) and are solely for the purpose of ruling on the suppression motion. The Court has included citations to the transcript for those facts that are contested and for direct quotes.

Unit"). Officer Zambito was in the driver seat and Corporal Evancoe was in the passenger seat.

The purpose of the Tac Unit is to interdict serious felony crimes in progress. On weekends, all Tac Unit squads concentrate on the downtown area, where they look for opportunities to interact with citizens coming into and out of the clubs located in the downtown corridor. Tac Units have no interest in making any arrests for misdemeanor offenses, nor are they interested in issuing notices for motor vehicle civil infractions. However, they investigate misdemeanor and traffic offenses pretextually to create more frequent citizen encounters in order to "show police presence until [ ] the [crime] trend has lessened" (Hr'g Tr. 6) and "to deter any potential crime that may come from the clubs" (*id.* at 55).

Putting the pretextual-stop plan into action, Evancoe advised Zambito that Sampson and his occupants were not wearing seatbelts in violation of Florida Statute § 316.614 (which Sampson denies (*id.* at 93–94)) and that Sampson had failed to turn into the proper lane when turning right onto Garland.[2] The officers then turned left onto Garland and followed Sampson north for two blocks where Sampson turned right onto Washington and then left into an open parking lot at 111 Washington Street.

Upon entering the parking lot, Sampson paid a parking attendant and backed into a parking spot. The officers followed him into the lot, pulled their Ford F-150 nose-to-nose with Sampson's Chevy Cruze—effectively blocking Sampson's vehicle in—and activated

---

[2] Garland is a three-lane, one-way street that runs north. Both officers are under the impression that, when turning right onto a three-lane street from a right-hand lane, the driver must turn into the nearest right-hand lane. They however could not cite a statute for this proposition, nor did the Government. They testified that Sampson turned from the right lane into the center lane (Hr'g Tr. 9, 61), which Mr. Sampson denies (*id.* at 91).

2

their lights and sirens. Thereafter, the officers exited their vehicle—Zambito with his gun in the index position held against his chest pointing down and Evancoe with his gun in his holster—and commanded Sampson and the other passengers to raise their hands. The officers testified that, upon this command, Sampson made "furtive" movements with his right hand between the center console and the driver's seat (*id.* at 13, 63), which, based on their experience, led them to believe that Sampson could be "concealing evidence or potentially arming himself" (*id.* at 13). Contrarily, Sampson testified that he immediately complied with the officers' commands to raise his hands. (*Id.* at 95.)

Ultimately, all three occupants complied and Evancoe "did not feel an immediate threat of any danger" (*id.* at 15) and told them to put their hands down. Evancoe then asked if there were any weapons in the car, to which Sampson replied "no." Evancoe then advised that the reason for the stop was the improper lane change and seatbelt violation. Meanwhile, Zambito, who was positioned near the front tire on the passenger side of Sampson's vehicle looking through the front windshield, saw "a green leafy substance" that he recognized to be marijuana on the backseat passenger's pants. (*Id.* at 64). Zambito told Evancoe about the marijuana on the passenger's pants, which prompted Evancoe to call for back up. (*Id.* at 17.) Once back-up officers arrived,[3] Evancoe told Sampson to exit the vehicle because they "were now conducting a narcotics investigation." (*Id.*)

Evancoe again asked Sampson if he had any weapons on him, to which Sampson again said "no." He then proceeded to search Sampson, finding a folding pocket knife in

---

[3] Sampson testified that he never saw any other officers at the scene. (Hr'g Tr. 101.) Zambito corroborated Evancoe's testimony that other officers arrived before Evancoe had Sampson exit the vehicle. (*Id.* at 65.)

3

Sampson's front right pocket and a pistol in his back pocket. Upon finding the pistol, Evancoe handcuffed Sampson. When the search was over, Evancoe made a comment to Sampson along the lines of "I thought you said you didn't have any weapons on you," which Sampson testified ended with a racial epithet (*id.* at 103–104), and Sampson replied "I'm sorry." No *Miranda* warnings were ever given.

At this point, with Sampson secured in handcuffs and seated on the ground behind his vehicle, Evancoe searched the other two passengers. Each of them had a one-gram bag of cannabis.[4] The officers seized the cannabis, but neither of the other two passengers were arrested. After a records search revealed that Sampson did not have a concealed weapons permit on file, he was arrested for possession of a firearm by a convicted felon. (Doc. 30-1.)

On July 9, 2014, a federal grand jury issued an indictment charging Sampson, who was previously convicted of involuntary manslaughter in the Virgin Islands, with being a felon in possession of a firearm. (Doc. 1.) Sampson was arrested on October 31, 2014. (Docs. 4, 5, 11.) On November 5, 2014, the Court entered an Order committing Sampson to custody pending trial. (Doc. 9.) Sampson pled "not guilty" at his arraignment two days later. (Doc. 13.)

On February 9, 2015, Sampson filed a motion to suppress the results of the search. (Doc. 30.) The Government opposes. (Doc. 34.) The Court held a suppression hearing on March 3, 2015. (Doc. 35.) This matter is now ripe for the Court's adjudication.

## STANDARDS

The Fourth Amendment to the U.S. Constitution prohibits "unreasonable searches

---

[4] The search did not reveal any marijuana on Sampson's person.

4

and seizures." U.S. Const. amend IV. A warrantless arrest is reasonable if it is supported by probable cause, and a warrantless search is reasonable if it is incident to a lawful arrest. *See Beck v. Ohio*, 379 U.S. 89, 90 (1964). Further, the Fourth Amendment permits brief, investigatory stops if they are supported by reasonable, articulable suspicion that criminal activity is afoot. *Terry v. Ohio*, 392 U.S. 1, 19–20 (1968); *United States v. Franklin*, 323 F.3d 1298, 1301 (11th Cir. 2003) (citing *Illinois v. Wardlow*, 528 U.S. 119 (2000)). During these stops, officers may frisk a temporarily-detained individual if they have reasonable cause to suspect that the individual is armed and dangerous. *Terry*, 392 U.S. at 24.

## DISCUSSION

Over the course of the suppression proceedings, the issues and arguments evolved from those in the parties' briefs (Docs. 30, 34). As it stands, Sampson moves to suppress the pistol, ammunition, and his post-arrest statement on the grounds that: (1) the stop was pretextual and the officers did not have probable cause to pull him over; and (2) the subsequent search of Sampson was illegal. The Government argues that the officers legally stopped Sampson based on their belief that he committed a civil traffic infraction. Additionally, it argues that the search of Sampson was a valid *Terry* search or, alternatively, a valid search incident to arrest or based on probable cause. The Court will address each argument in turn.

### I.   **The Stop**

As an initial matter, *Whren v. United States* forecloses Sampson's argument that the pretextual nature invalidates the traffic stop: the constitutional reasonableness of traffic stops does not depend on the actual motivations of the individual officers involved

so long as they had probable cause. 517 U.S. 806, 813 (1996).

In *Whren*, the Supreme Court held that "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Id.* at 810. Probable cause is an objective inquiry. *Id.* at 812–13. Crediting the officers' testimony that Sampson committed civil traffic infractions by not wearing a seatbelt and making an improper lane change, they had probable cause to make a traffic stop.[5] *See id.*; *see also United States. v. Holloman*, 113 F.3d 192, 195 (11th Cir. 1997).

## II.   The Search

Following a legal traffic stop, an officer may conduct a *Terry* "frisk" or search if he "harbor[s] a reasonable suspicion that the person subjected to the frisk is armed and dangerous." *Johnson*, 555 U.S. at 327. This condition is satisfied if the officer suspects that the stopped person poses a danger or has a weapon. *See Mimms*, 434 U.S. at 112 (explaining that officer's search after a traffic stop was justified when he saw a "bulge in the [passenger's] jacket that permitted the officer to conclude that [the passenger] was armed and thus posed a serious and present danger to the safety of the officer"). Aside from their assertions that Sampson made "furtive" gestures towards the center console at the beginning of the stop,[6] the officers offered no testimony that they had reason to

---

[5] Once they had legally pulled Sampson over, the officers could lawfully order him to get out of the car. *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977). In *Mimms*, the Supreme Court held that officers could justifiably order a driver to get out of the car after he was lawfully detained—even when the state "freely concede[d] the officer had no reason to suspect foul play from the particular driver at the time of the stop"—because this additional intrusion is only "*de minimis.*" *Id.* at 109, 111. The Court explained, "[w]hat is at most a mere inconvenience cannot prevail when balanced against legitimate concerns for the officer's safety" once an officer pulls over a vehicle for a traffic infraction. *Id.* at 111.

[6] The officers testified that Sampson made "furtive" movements, a term that should be considered with skepticism. *See United States v. Broomfield*, 417 F.3d 654, 655

6

suspect that the passengers were armed or dangerous. Indeed, their testimony reveals the exact opposite: they both stated that the situation was "calm" and Corporal Evancoe even allowed the occupants to put their hands down because he "did not feel an immediate threat of any danger." (Hr'g Tr. 15.) Thus, there was no *Terry* justification for a search of Sampson.

The Government's argument that the search was justified as a search incident to a warrantless arrest supported by probable cause is equally unavailing. "A warrantless arrest of an individual in a public place for a felony, or a misdemeanor committed in the officer's presence, is consistent with the Fourth Amendment [only] if the arrest is supported by probable cause." *Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (citing *United States v. Watson*, 423 U.S. 411, 424 (1976)). "Probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully reduced to a neat set of legal rules." *Pringle*, 540 U.S. at 370–71 (citation omitted). However, "the substance of all the definitions of probable cause is reasonable ground for belief of guilt . . . [which] must be particularized with respect to the person to be searched or seized." *Id.* at 371 (citing *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979)). The inquiry is focused on the totality of the circumstances. *Pringle*, 540 U.S. at 371. The test is whether an objectively reasonable police officer would find that the events leading up to the arrest amount to particularized probable cause. *Id.* Crediting the testimony (difficult as it is) that Officer Zambito identified loose cannabis on the backseat passenger's lap from his vantage point at the vehicle's front passenger side wheel looking through the

---

(7th Cir. 2005); *United States v. Rodriguez*, 976 F.2d 592, 595 (9th Cir. 1992); *Ruiz v. Florida*, 50 So. 3d 1229, 1232 (Fla. 4th DCA 2011).

7

front windshield with headlight illumination, the question here is whether the officers had probable cause to believe that Sampson—the driver—had committed any crime.

Given that Officer Zambito singled out the guilty party—that is, he identified loose marijuana on the pants of only the back seat passenger—with no evidence that Sampson had access to that small amount of marijuana, the officers lacked probable cause to believe that Sampson was committing a crime. *See United States v. Di Re*, 332 U.S. 581, 594 (1948) ("Any inference that everyone on the scene of a crime is a party to it must disappear" if the guilty person is singled out). Thus, the search of Sampson was unjustified.

In its brief, the Government relies on *Pringle* for the proposition that the "discovery of illegal controlled substances on a backseat passenger's pants . . . gives officers probable cause to search the vehicle and all of its occupants." (Doc. 34, pp. 5–7.) The Court is not persuaded for two reasons. First, *Pringle* does not stand for such a broad or bright-line proposition. The *Pringle* court explicated that its inquiry was one of a totality of the circumstances. *See*, 540 U.S. at 370–71. Second, *Pringle* is easily distinguishable from this case. In *Pringle*, the Supreme Court held that a reasonable officer could conclude "that there was probable cause to believe [the defendant] committed the crime of possession of cocaine, either solely or jointly," based on the following facts: (1) he was one of three men riding in a car at 3:16 a.m.; (2) there was $763 of rolled-up cash in the glove compartment directly in front of him; (3) there were five plastic baggies of cocaine behind the back-seat armrest that were accessible to all three men; and (4) upon questioning, none of the men offered any information with respect to the ownership of the cocaine or the money. *Id.* at 800. Given the facts of *Pringle*, the Court thought it "an

entirely reasonable inference" to believe that the defendant "had knowledge of, and exercised dominion and control over, the cocaine." *Id.* Here, the officers only identified a small amount of loose marijuana on a backseat passenger (aside from the two small baggies of marijuana revealed on the passengers' persons during subsequent searches), not Sampson. They did not find anything suspicious in the passenger compartment or anywhere else in the vehicle. These facts do not support the inference that Sampson had control over the loose marijuana ostensibly spied on the passenger's lap. *See Ybarra*, 444 U.S. at 91 ("A person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person.").

During oral argument, the Government advocated for what seems to be a bright-line application of *Pringle*—that the identification of marijuana in plain view in a car amounts to probable cause to arrest any or all of the occupants.[7] (Hr'g Tr. 135.) By its own research, the Court located two unpublished opinions by the Eleventh Circuit that include similar broad applications of the *Pringle* holding. *See United States v. Major*, 341 F. App'x 549 (11th Cir. 2009); *United States v. Phillips*, 327 F. App'x 855 (11th Cir. 2009). Both of these cases cite *Pringle* for the proposition that "if drugs are found in the backseat area of a car, those drugs can be used as a basis to arrest all of the car's occupants because a reasonable officer could conclude that there was probable cause to believe that any of those occupants had knowledge of, and exercised dominion and

---

[7] The assigned Assistant U.S. Attorney acknowledged that courts consider the totality of the circumstances. (Hr'g Tr. 135–36.) However, when questioned by the Court about the grounds for the search, he continually argued that the loose marijuana in plain view on the back seat passenger amounted to probable cause to arrest the driver and conduct a search incident to arrest. (*Id.* at 132–136.)

9

control over, the drugs." *Major*, 341 F. App'x at 551; *Phillips*, 327 F. App'x at 858. This language is dicta in both opinions and extends *Pringle* well beyond its holding.

In *Major*, the defendant, who was a passenger in a car that was legally stopped by officers (based on information from a confidential informant that the car contained cocaine), was arrested for conspiracy to possess with intent to distribute cocaine after the officers found drugs in a duffle bag inside the car. 341 F. App'x at 550. The defendant moved to suppress the drugs, arguing that no evidence was presented that tied him to the drugs in the duffle bag. *Id.* at 551. In affirming the district court's denial of the defendant's motion to suppress, the Eleventh Circuit considered the following facts, all in light of the advance information from the confidential informant that a drug transaction was in the offing: (1) the defendant had access to the contents of the duffle bag; (2) "it could reasonably be assumed that he had knowledge of the drugs"; and (3) it was probable that he was involved with a drug transaction because "he was in [the driver's] vehicle at the precise time and place [the driver] was scheduled to make a significant cocaine sale," which the court considered "an unlikely situation for an unknowing passenger merely along for the ride." *Id.* at 50–51. Thus, the totality of the facts and circumstances within the officers' knowledge would cause a reasonably prudent person to believe that the suspect had committed, was committing, or was about to commit an offense.

As to *Phillips*, despite its citation to *Pringle*, the decision rested on completely different grounds. In *Phillips*, the defendant, a driver who was arrested during a legal stop (based again on information from a confidential informant that drugs were inside the vehicle), argued that his arrest was unconstitutional because it was prompted by an illegal

search of his person based on contraband found in his passenger's pocket and "there was no evidence that [he] was in any way connected to [that] contraband." *See* 327 F. App'x 855, 858 (11th Cir. 2009). The court concluded that the defendant's suppression motion was properly denied because the drugs that led to his arrest would have inevitably been discovered. *Id.* at 858–59. The court explained that

> [t]he evidence that was found on [the defendant's] person was admissible, under the inevitable discovery doctrine, because the lawful arrest of his passenger entitled the police to search the passenger compartment of [his] car, and this search provided sufficient evidence to arrest [him] and to search him incident to his arrest.

*Id.* at 859; *see also United States v. Gonzalez*, 71 F.3d 819, 824 (11th Cir. 1996) (explaining that once an occupant of a vehicle is the subject of a lawful arrest, officers can conduct a contemporaneous warrantless search of the passenger compartment of the vehicle incident to arrest).[8]

Neither *Major* nor *Phillips* support the bright-line application of *Pringle* urged by the Government, nor does any other case that the Court has encountered in its research. Rather, the reasonableness of the search in the context of the Fourth Amendment continues to be governed by a totality of the circumstances standard. *Pringle*, 540 U.S. at 371.

## CONCLUSION

As is typically the case in litigating the propriety of police conduct in Fourth Amendment cases, law abiding citizens man the watchtowers of liberty with convicted felons, bad actors, and indisputable criminals. Caught red-handed, they are left to make

---

[8] Here, the Government has not established that the firearm would have inevitably been discovered.

11

the case that "the criminal is to go free because the constable has blundered." *People v. Defore*, 150 N.E. 585, 587 (1926), *abrogated on other grounds by Linkletter v. Walker*, 381 U.S. 618, 633 (1965).

The instinct, experience, intuition, and "nose" for ongoing criminal activity displayed by these officers in this situation cannot be questioned. The officers thought something was amiss and their instinct proved correct—they recovered a loaded firearm from Sampson, a previously convicted felon. However, the correctness of hindsight is not the proper lens for constitutional scrutiny. The cost of abandoning the protections of the Fourth Amendment exacts too high a price to allow the result of the search to filter its constitutional propriety.

The totality of the circumstances leading up to the search of Sampson simply do not amount to probable cause that Sampson had committed, was committing, or was about to commit a crime. The search therefore contravened the Fourth Amendment and the fruits of that search as well as Sampson's statement post-search must be suppressed.

Accordingly, it is hereby **ORDERED AND ADJUDGED** that Defendant Marcus Sampson's Motion to Suppress Physical Evidence and Statement Evidence and Incorporated Memorandum of Law (Doc. 30) is **GRANTED**.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on March 26, 2015.

ROY B. DALTON JR.
United States District Judge

Copies:

Counsel of Record